1  Allison Straker, Pro Se
2  506 Skyline Drive
   Blakeslee, PA 18610
3  Phone 917 442-0485

# 3: CV 09 - 338

4  ## IN THE UNITED STATES DISTRICT COURT

5  ## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

FILED
SCRANTON

6

7  ALLISON STRAKER,                    )
                                       )          FEB 23 2009
8          Plaintiff,                  )   Case No.:
                                       )          K7C
9          vs.                         )   PER _____
                                       )          DEPUTY CLERK
10 DEUTSCHE BANK NATIONAL TRUST        )   **COMPLAINT FOR TRUTH IN**
   AS TRUSTEE; PENN AMERICAN           )   **LENDING VIOLATIONS; FOR**
11 MORTGAGE; MORTGAGE                  )   **RESCISSION; VIOLATIONS OF**
   ELECTRONIC REGISTRATION             )   **RESPA; HOEPA VIOLATIONS;**
12 SYSTEMS, INC.; FREEMONT             )   **FAIR CREDIT REPORTING ACT**
   INVESTMENT & LOAN; HOMEQ            )   **VIOLATIONS; FRAUDULENT**
13 SERVICING AND JOHN DOES 1-1000,     )   **MISREPRESENTATION; UNJUST**
                                       )   **ENRICHMENT; CIVIL RICO;**
14                                     )   **CIVIL CONSPIRACY; QUIET**
                                       )   **TITLE; USURY; DECLARATORY**
15         Defendants.                 )   **AND INJUNCTIVE RELIEF**
                                       )
16                                     )
                                       )
17

18

19  _____

20         ALLISON STRAKER, Plaintiff, pro se, sues Defendants DEUTSCHE BANK

21  NATIONAL TRUST COMPANY AS TRUSTEE, PENN AMERICAN MORTGAGE;

22  FREEMONT INVESTMENT & LOAN; HOMEQ SERVICING and JOHN DOES 1-1000.  In

23  support thereof she states:

24                          **PRELIMINARY STATEMENT**

25  1.      This Complaint is filed under the Real Estate Settlement Procedures Act 12 U.S.C.

26  section 2605 (RESPA), to enforce Plaintiff's rights to recover statutory damages, actual

27  damages and reasonable fees and costs of this action by reason of Defendant's violations of

28  RESPA as set forth more fully herein.  Notwithstanding the provisions of RESPA, Defendants

    have ignored Plaintiff's rights to receive disclosures regarding the servicing of her mortgage

loan and the administration of escrow accounts. Furthermore, no Defendant, here known or unknown, has established the right to pursue foreclosure of Plaintiff's home by virtue of a complete and total failure to establish ownership of the original "wet ink" promissory note and Mortgage, including any chain of title leading to such ownership. Furthermore, no "holder in due course" of the alleged mortgage note can be established or verified.

## JURISDICTION

2.     Jurisdiction is conferred on this Court by 12 U.S.C. Sec. 260. The Court has authority to issue a declaratory judgment by virtue of 28 U.S.C. Sec. 2201. Plaintiff further pleads jurisdiction pursuant to the doctrine of *pendent* jurisdiction as to various related State Law causes of action.

## PARTIES

3.     The Plaintiff, ALLISON STRAKER, is a natural person residing at 506 Skyline Drive, Blakeslee, PA 18610.

4.     Defendant DEUTSCHE BANK NATIONAL TRUST AS TRUSTEE, is upon information and belief a real estate trust and a real estate mortgage investment conduit (REMIC), investing in certain asset-backed securities for which Plaintiff's mortgage was, in part, used to secure issuance of said asset-backed securities.

5.     Defendant PENN AMERICAN MORTGAGE, is a mortgage company that, on information and belief doing business in the Commonwealth of Pennsylvania.

6.     Defendant MORTGAGE ELECTRONIC REGISTRATION SYSTEMS (MERS), on information and belief, is a Delaware corporation that offers electronic registration and tracking services of mortgages and claims to be beneficiary and/or trustee of subject note and Mortgage. Furthermore, on information and belief, MERS does not have a Statutory Agent listed with the Pennsylvania Secretary of State, Division of Corporations.

7.     Defendant FREEMONT INVESTMENT & LOAN, is a mortgage broker engaged in the business of brokering mortgage loans and doing business in the commonwealth of Pennsylvania.

8.     Defendant HOMEQ, is  on information and belief is a servicing company that engages in servicing mortgage loans doing business in the commonwealth of Pennsylvania.

9.   JOHN DOES 1-1000; on information and belief, these are unknown individual persons who have invested in the securities known as the Deutsche Bank National Trust As Trustee. These securities may be or claim to be the "holders in due course" of the subject note on Plaintiff's property.

**10.**   Plaintiff respectfully requests of the Court leave to add new or further Defendants by leave of Court when and if such shall become known.

### NATURE OF THE ACTION

11.   This case arises out of Defendants' egregious and ongoing and far reaching fraudulent schemes for improper use of Plaintiff's identify, fraud in the inducement, fraud in the execution, usury, and breaches of contractual and fiduciary obligations as Mortgagee or "Trustee" on the Security Deed, "Mortgage Brokers," "Loan Originators," "Loan Seller," "Mortgage Aggregator," "Trustee of Pooled Assets," "Trustee or Officers of Structured Investment Vehicle", "Investment Banker", "Trustee of Special Purpose Vehicle/Issuer of Certificates of 'Asset-backed Certificates'" , Seller of 'Asset-Backed' Certificates (shares of bonds)," "Special Servicer," "Master Servicer," "Beneficiary," and "Trustee," respectively, of certain mortgage loans pooled together in a trust fund; specifically Deutsche Bank National Trust as Trustee.

12.   Participants in the securitization scheme described herein have devised business plans to reap millions of dollars in profits at the expense of Plaintiff and others, as well as investors in certain trust funds.

13.   In addition to seeking compensatory, consequential and other damages, Plaintiff seeks declaratory relief as to what (if any) party, entity or individual or group thereof is the owner of the original wet ink promissory note executed at the time of the loan closing, and whether the Security Deed secures any obligation of the Plaintiff, and a Mandatory Injunction requiring reconveyance of the subject property to the Plaintiff or, in the alternative a Final Judgment granting Plaintiff Quiet Title to the subject property.

### FACTS

Summary of the Facts of this Case

14.    On or about June 2, 2006, Plaintiff entered into a consumer credit transaction with Defendant Freemont Investment & Loan, in which the extended consumer credit was subject to a finance charge and which was initially payable to Defendant Freemont Investment & Loan.

15.    Plaintiff is the nominal payor on the subject promissory note. The Loan Seller is a financial institution that was paid a fee to pose as a residential mortgage lender, when in fact the source of loan funds and the actual lender was the Investors in Certificates, '*JOHN DOES 1-1000*' and other parties whose identities and receipt of fees and profits were withheld from Plaintiff at closing and, despite numerous requests, continue to be withheld from Plaintiff by the Defendants contrary to the requirements of Federal Law and applicable State Law.

16.    Unknown to Plaintiff, the Loan Seller, acting as principal in its relationships with the "independent appraiser" of the property and the mortgage broker and mortgage originator, induced the Plaintiff into a transaction that did not and could not meet normal underwriting standards for a residential mortgage. The Loan Seller posed as a conventional mortgage, lender thus leading Plaintiff to reasonably believe that the Loan Seller, the mortgage broker, and the loan originator had an interest in the successful repayment of the loan and of the transaction that Plaintiff was induced to believe was being executed at the time of the "closing" of the subject loan transaction.

17.    In fact, the Loan Seller, mortgage broker, appraiser, loan originator, title agent, escrow agent and Trustee on the Security Deed had no financial stake or liability in the transaction and no interest other than obtaining Plaintiff's signature on a "loan" that could never be repaid, contrary to the representations and assurances from the conspiring participants in this fraudulent scheme. In fact, the "Appraisal" was intentionally and knowingly inflated along with other loan data to justify the closing of the "loan transaction." Plaintiff relied upon the due diligence of the apparent "Lender" (i.e., actually the Loan Seller) in executing and accepting the closing documents. In fact, no "lender" was involved in the closing in the sense of an entity performing due diligence and evaluation pursuant to national standards for underwriting and evaluating risk of loaning money in a residential loan closing. Thus, no bank or other financial institution actually performing under the standards, rules and regulations governing such institutions was the "lender" which is the basis for Plaintiff's cause of action, to wit: that the inflated appraisal

added an undisclosed cost to the loan which, when added to the other terms, disclosed and undisclosed, and amortized over the real expected life of the "loan" exceeds the limits set by the Commonwealth's Legislature for usury and is not subject to exemption because the presence of a financial institution in the transaction was a ruse in which the form of the transaction covered over and mislead the Plaintiff as to the real parties in interest and the fees generated by the production of the subject "loan transaction."

*18.* Prior to June 2, 2006, and in the application process for the involved consumer credit, Plaintiff had been told by the loan originator that the transaction was to be between Plaintiff and Freemont Investment & Loan.

*19.* Plaintiff alleges that Defendants and each of them neither explained the workings of all of the adjustable interest rate(s), how it is computed nor its inherent volatility. Furthermore, no written figures were provided to Plaintiff showing the final payment of the loan at the ending interest rate, which "lender" knew Plaintiff would not qualify for. Furthermore, Plaintiff was not given the documents three (3) days prior to closing as is required by law.

20. Subsequent to the settlement, Plaintiff received written notice from that she was to pay her periodic payments to HomEq Servicing. Plaintiff was not notified of any change of ownership, lender, investors, Trustee or Beneficiary.

21. The Defendants' purpose was solely to collect fees, rebates, kickbacks and profits that were never disclosed to Plaintiff and have only recently been discovered by Plaintiff through consultation with experts in the forensic mortgage loan auditing field and in the securitization of residential mortgage loans, and diligent research including the filings of some parties with the Securities and Exchange Commission which disclose the normal manner of operating this fraudulent scheme.

22. Freemont Investment & Loan was named as the Lender on the subject promissory note under the mortgage terms allegedly securing the performance under the subject note. HomEq Servicing was named as servicer at the time of the alleged "closing" of the "loan transaction." 'MERS' was named as the nominee for Lender and for Lender's successors and assigns at the time of the alleged "closing" of the "loan transaction." In accordance with Commonwealth Law, the Deed and terms of security were recorded in the county records.

23.    Notwithstanding the above, and without the knowledge of the Plaintiff, the Loan Seller had entered into Assignment and Assumption Agreements with one or more parties and Polling and Service Agreements with one or more parties including, but not limited to the mortgage aggregator prior to or contemporaneously with the "Closing" of the subject "loan transaction." Under the terms of these agreements, the Loan Seller received a sum of money, usually on receiving an application for a loan equal to the gross amount of the loan sought by Plaintiff plus a fee of 2.5% or more which was allocated to the subject loan transaction. These actions categorize the "loan transaction" as a "Table Loan" expressly prohibited under TILA regulations.

24.    Contrary to the documents presented before and during the "closing" of the "loan transaction" the Loan Seller was neither the source of funding nor the "Lender." Thus, at the time of recording, the source of funding and the "Lender" was a different entity than the nominal mortgagee or beneficiary under the Security deed and was neither named nor disclosed in any fashion. The security for the "loan" thus secured an obligation that had been paid in full by a third party. Said third parties were acting as a financial institution or "Lender" without even having been chartered or registered to do so despite regulations to the contrary from laws and rules of State and Federal authorities and/or agencies.

25.    Some form of documentation represented by the "Loan Seller" to the "Mortgage Aggregator" was presented before or contemporaneously with the "closing" of the loan transaction. In some cases, the documentation included actual copies of the documents presented at "Closing." In most cases it consisted of either forged blank notes or vague descriptions of the content of the notes that were placed into the pool of assets that would be "securitized." Plaintiff has discovered numerous cases in which the "loan closing" either did not take place at all or included documentation substantially different than the original offer and acceptance and substantially different that what could have been reported to the Mortgage Aggregator prior to the "closing." Plaintiff has discovered numerous cases in which foreclosure has proceeded despite the fact that no loan closing was ever consummated, no papers were ever signed, or the loans were properly rescinded under law.

26.     Plaintiff does not know what version of documentation was presented to the Mortgage Aggregator and if the Mortgage Aggregator took one or more varying descriptions of the alleged "loan documents" into more than one pool of assets which was eventually sold for the purpose of securitizing the assets of the pool which included subject loan transaction either once or more than once.

27.     There is no assignment of the subject mortgage in the county records, but there may be a non-recorded "Pooling and Services" Agreement and a non-recorded Assignment and Assumption Agreement which appears to substitute the Trustee over the pooled assets for the nominee of the lender under the Security Deed.  The powers of this second Trustee were, upon information and belief,  in turn transferred to either a Trustee for a Special Investment Vehicle (which performed the accounting and reporting of the pooled assets) or to an investment bank Collateral Debt Obligation manager whose department performed the accounting reporting of the pooled assets.  The reporting of the pooled assets consisted principally of descriptions of the notes "signed" by borrowers and limited descriptions of the general terms of the note such that the note appeared to be more valuable than the initial terms of payment by the "borrower."

28.     The note from the subject "loan transaction" was eventually allocated into a new corporation (Special Purpose Vehicle herein referred to as SPV) formed for the express purpose of holding the pooled assets under certain terms.  The terms included the allocation of payments from one note to pay any deficiency in payment of another note in unrelated "loan transactions" contrary to the terms of each such note which required payments to be allocated to the principal, interest, escrow and fees associated with only that specific "loan transaction."  Whether such "deficiency" was caused by the difference between the higher general terms of description of the note or the lower actual payment requirements from the "borrower" is not known.

29.     The Investment Banking firm arranged through payment for a false inflated appraisal of the certificates and/or issuer of the certificates that would be sold to investors in much the same way as it had procured the false appraisal of the property that "secured" the "loan transaction." In addition, insurance was purchased from proceeds of this transaction, credit default swaps were purchased from proceeds of the transaction, the investors investments "oversold" to create a reserve pool from which the SPV could pay deficiencies in payments, and the SPV created

cross-collateralization agreements and overcollateralization of the pool assets to assure payments to the investors, thus creating co-obligors on the payment stream due from the Plaintiff on the subject "loan transaction."

30.     The pooled assets, including the Plaintiff's subject "loan transaction" were pledged completely to the owners of the "asset-backed securities." All the certificates were then transferred to a Seller who, in turn, sold the certificates in varying denominations, each of which had slightly different terms depending upon which segment of the pool (tranche) secured the investment.

31.     If there is a holder in due course of the Plaintiff's note arising from the subject "loan transaction" it is the investors who purchased said securities (certificates) named herein as JOHN DOES 1-1000. Some of said securities are held by the original purchaser thereof, others were sold at weekly auction markets, others were paid by re-sales of property that was "secured," others were paid from prepayments, others were paid by sale at full or partial price to the investment bank that originated the entire transaction, some of which might be held by the Federal Reserve as non-recourse collateral, and others might have been paid by one or more of the insurance, credit default swaps, cross guarantees or cross collateralization of the segment of the pool that secured the relevant investor who owned certificates backed by a pool of assets that included the subject "loan transaction".

32.     It is doubtful that any of the Defendants have any knowledge or have made any effort to determine whether the putative holders in due course have been paid in whole or in part. It can only be said with certainty that these Defendants seek to enforce loan documents for which they have already been paid in full plus illegal fees for participating in an illegal scheme. These Defendants seek to add insult to injury by demanding ownership of the property in addition to the receipt of payment in full, long before any delinquency or default even allegedly occurred.

33.     In order for these Defendants to maintain legal standing in connection with the subject loan transaction they are required to show the entire chain of title of the note and the entire chain of title of the mortgage. They have refused to do this despite numerous requests, leading Plaintiff to conclude that the Defendants cannot produce such evidence of a complete chain of title or are intentionally withholding the information that would show breaks in such chain.

34.    Plaintiff is left in the position of being in an adversary proceeding with ghosts.  While these Defendants may offer indemnification for any third party claims, the fact remains that any relief awarded these defendants, any standing allowed to these defendants would expose the Plaintiff to multiple claims and suits from an unknown number of parties and entities that all claim, possibly correctly, to be holders in due course.  Any grant of a certificate of title to an entity other than Plaintiff or the nominal mortgagee creates an incurable defect in title.

35.    There is no recording of any document in the county records which predates the Defendants' attempt to initiate foreclosure or which would authorize them to proceed.

### Significance of REMIC

36.    Mortgage Backed Securities (MBS) Certificates are "pass through Certificates," where the Trust has elected to be treated as a Real Estate Mortgage Investment Conduit ("REMIC") to enjoy the tax exempt status allowed under 26 U.S.C. sec. 860 (A-G).  REMIC regulations impose very strict limitations as to the nature of the investments a REMIC trust may make (i.e. "permitted investments") and transactions which may not be undertaken (i.e. "prohibited transactions").  Any violation of REMIC regulations has significant tax implications for the Trust, as well as all Certificate holders.  For example, any income realized by the Trust from a "prohibited transaction" is taxed at 100%.  The REMIC regulations also provide that any entity that causes the REMIC regulations to be violated is liable to the Trust and the Certificate holders for the entire amount of the tax.

37.    Only income from "qualified mortgages" and "permitted investments" may enter a REMIC trust.  A "qualified mortgage" is an obligation (i.e. mortgage) which is principally secured by an interest in real property which (1) was transferred to the Trust on the startup date; (2) was purchased by the REMIC Trust within 3 months after the startup date; or (3) any qualified replacement mortgage.

38.    Permitted investments are limited to:

a)    Cash Flow Investments (i.e. temporary investment where the Trust holds money it has received from qualified mortgages pending distribution to the Certificate holders);

b)    Qualified Reserve Assets (i.e. any intangible property which is held for investment and is part of a reasonable required reserve to provide for full payment of expenses of the REMIC or

amounts due on a regular interval in the event of defaults on qualified mortgages or lower than expected returns on cash flow investments. These investments are for defined purposes only and are to be passive in nature. They must be "reasonably required."

**c)**     Liquidation Proceeds from "foreclosed property" which is acquired in connection with the default or imminent default of a "qualified mortgage" held by the Trust. In order to maintain the REMIC status, the Trustee and the Servicers must ensure that the REMIC receives no income from any asset that is not a "Qualified Mortgage" or a "Permitted Investment." 26 U.S.C. sec. 860F(a)(2)(B).

39.     Prohibited Transactions include the disposition of a qualified mortgage (except where the disposition is "incident to" the foreclosure, default, or imminent default of the mortgage); or the receipt of any income from an asset that is not a Qualified Mortgage or a Permitted Investment. 26 U.S.C. sec. 860F(a)(2)(B).

40.     Prohibited Transactions are taxed in an amount 100% of the REMIC's net income from such prohibited transaction. 26 U.S.C. § 860 F (a) (1).

41.     Contributions of any "property" -- e.g., cash, mortgages, etc. – made to the REMIC are taxed at 100% of the contribution, except for the four following exceptions:

**a)**     Contributions to facilitate a "clean up call" (i.e. the redemption of a class of regular interest, when by reason of prior payments with respect to those interests the administrative costs associated with servicing that class outweigh the benefits of maintaining the class). 26 CFR§ 1.860G-2(j) (I).

**b)**     Any cash payment in the nature of a guarantee, such as payments to the REMIC. Any violation of REMIC regulations will defeat the privileged tax status and will subject the REMIC to 100% taxation, plus penalties and interest. These taxes and penalties are ultimately borne by the Certificate holders, under a surety bond, letter of credit or insurance policy.

**c)**     Any cash contribution during the three month period after the startup day; and

**d)**     Any cash contribution to a qualified reserve fund made by a holder of a residual interest.

42.     On a monthly basis, the Investment Banking firm and/or its agents, servants or employees, compiled, individually and in concert, oversaw and approved all the information contained in the Distribution Reports and electronically sent same to certain parties. The date

regarding the number of bankruptcies, aggregate Special Servicing Fees, and aggregate Trust Fund Expenses was routinely incomplete, false and/or misleading.

43.    The Distribution Reports are supposed to accurately reflect the "financial health of the trust," and provide Certificate holders, with important data such as the number of loans in bankruptcy, the aggregate amount of special servicing fees, and the aggregate amounts of trust fund expenses. Each and every one of these categories is essential to assess its' profit and loss potential in the REMIC entity. Furthermore, this data is used by bond rating agencies to assess the value of the Certificates.

44.    Based upon the filings and on information and belief of the Plaintiff, it appears that no accurate accounting has ever been presented to anyone and that, therefore, the identity and status of any putative holder in due course is completely shrouded in secrecy enforced by these Defendants, their agents, servants and employees. Unreported repurchases of certificates or classes of certificates would and did result in a profit to the REMIC that went unreported, and which was not credited to borrowers where the repurchase was, as was usually the case, for far less than the original investment. While the Plaintiff would never have entered into a transaction in which the true nature of this scheme was revealed, any profits, refunds, rebates, fees, points, costs or other income or gain should be credited on same basis to said borrowers including Plaintiff herein.

45.    The end result of the false and misleading representations and material omissions of Defendants as to the true nature of the mortgage loan actually being processed, which said Defendants had actual knowledge, was in direct conflict with the original Uniform Residential Loan Application, Truth In Lending, and Plaintiff's stated intentions and directions to said Defendants at the time of original application for the loan. This fraudulently caused Plaintiff to execute predatory loan documents on a note that was either paid or prepaid by JOHN DOES 1-1000 through Deutsche Bank National Trust as Trustee, created for the specific purpose of obtaining Mortgage Notes through a d/b/a regardless of the ability to repay said "loan transaction" by the property owner. Furthermore, the "loan transaction" was written in such a way as to conceal the fact that the true costs of the loan would have prevented the Plaintiff from

qualifying for the payment structure in the future, thereby setting up the final purpose of this "loan transaction" which was to deprive Plaintiff of her property.

46.     At no time whatsoever did Defendants ever advise Plaintiff that:

**a)**  the mortgage loan being processed was not in her best interest;

**b)**  the terms of the mortgage loan being processed were less favorable than loan which Defendants previously advised Plaintiff that she qualified for;

**c)**  that the adjustable rate mortgage loan was an inter-temporal transaction (transaction where terms, risks, or provisions at the commencement of the transaction differ at a later time) on which Plaintiff had only qualified at the initial fixed rate but had not and could not qualify for the loan once the interest rate terms changed after year 2;

**d)**  that, as a result of the change in interest rate after year 2, Plaintiff would not be able to meet her financial obligations on the loan given his income and expense history previously provided to Defendants;

**e)**  that Plaintiff would likely be placed in a position of default, foreclosure, and deficiency judgment upon not being able to meet her increased loan obligations once the fixed rate interest period expired and the adjustable rate applied;

**f)**  that the originating "lender," that being Defendant Freemont Investment & Loan., had no intention of retaining ownership interest in the mortgage loan or fully servicing same and in fact may have already presold the loan, prior to closing, to a third party mortgage aggregator;

**g)**  that the mortgage loan was actually intended to be repeatedly sold and assigned to multiple third parties, including one or more mortgage aggregators and investment bankers (including, but not limited to Defendants, JOHN DOES 1-1000, for the ultimate purpose of bundling the Plaintiff's mortgage with hundreds or perhaps thousands of others as part of a companion, support, or other tranche in connection with the creation of a REMIC security known as a Collateralized Mortgage Obligation ("CMO"), also known as a "mortgage-backed security" to be sold by Deutsche Bank National Trust as Trustee.

**h)** that the mortgage instrument and Promissory Note may be sold, transferred, or assigned separately to separate third parties so that the later "holder" of the Promissory Note may not be in privity with or have the legal right to foreclose in the event of default;

**i)** that in connection with the multiple downline resale and assignment of the mortgage and Promissory Note that assignees or purchasers of the Note may make "paydowns" against the Note which may affect the true amount owed by Plaintiff on the Note:

**j)** that a successive assignee or purchase of the Note and Mortgage may not, upon assignment or purchase, unilaterally impose property insurance requirements different from those imposed as a condition of the original loan (also known as prohibition against increased forced-placed coverage) without Plaintiff's prior notice and consent.

47.     As a result of the closing and in connection therewith, Defendants placed the Plaintiff into a sub-prime adjustable rate mortgage program, with Defendants intentionally misleading Plaintiff and engaging in material omissions by failing to disclose to Plaintiff the fact that the nature of the mortgage loan application had been materially changed without Plaintiff's knowledge or consent and that Plaintiff was being placed into an adjustable rate mortgage program despite not being fully qualified for such a program.

48.     Prior to the closing, Defendants failed to provide to Plaintiff the preliminary disclosures required by the Truth-In-Lending Act pursuant to 12 CFR (also known as and referred to herein as Regulation Z) sec. 226.17 and 18, and failed to provide the preliminary disclosures required by the Real Estate Settlement Procedures Act ("RESPA") pursuant to 24 CFR sec. 3500.6 and 35007, otherwise known as the GFE.

49.     Defendants also intentionally failed and/or refused to provide Plaintiff with various disclosures which would indicate to the Plaintiff that the consumer credit contract entered into was void, illegal, and predatory in nature due in part to the fact that the final TIL showed a "fixed rate" schedule of payments, but did not provide the proper disclosures of the actual contractually-due amounts and rates.

50.     Defendants failed and/or refused to provide a Hud-1 Settlement Statement at the closing which reflected the true cost of the consumer credit transaction. As Defendants failed to provide

an accurate GFE or Itemization of Amount Financed ("IOAF"), there was no disclosure of a Yield Spread Premium "YSP" which is required to be disclosed by the Truth-In-Lending Act and thus, no disclosure of the true cost of the loan.

51.     As a direct and proximate result of these failures to disclose as required by the Truth-In-Lending Act, Defendants received a YSP in a substantial amount without preliminary disclosure, which is a per se violation of 12 CFR sec. 226.4(a), 226.17 and 18(d) and (c)(l)(iii).  The YSP raised the interest rate which was completely unknown to or approved by the Plaintiff, as he did not receive the required GFE or IOAF.

52.     In addition, the completely undisclosed YSP was not disclosed by Defendants in their broker contract, which contract was blank in the area as to fees to be paid to Defendants.  This is an illegal kickback in violation of 12 USC sec. 2607 as well as State Law which gives rise to all damages claims for all combined broker fees, costs, and attorneys' fees.

53.     The Amount Financed within the TIL is also understated which is a material violation of 12 CFR sec. 226.17 and 18, in addition to 15 USC sec. 1602(u), as the Amount Financed must be completely accurate with no tolerance.

54.     Defendants were under numerous legal obligations as fiduciaries and had the responsibility for overseeing the purported loan consummation to insure that the consummation was legal, proper, and that Plaintiff received all Act and RESPA both before and after closing.

55.     Plaintiff, not being in the consumer lending, mortgage broker, or residential loan business, reasonably relied upon the Defendants to insure that the consumer credit transaction was legal, proper, and complied with all applicable laws, rules, and regulations; and was in her best interest.

56.     At all times relevant hereto, Defendants regularly extended or offered to extend consumer credit for which a finance charge is or may be imposed or which, by written agreement, is payable in more that (4) installments and was initially payable to the person the subject of the transaction, rendering Defendants "creditors" within the meaning of the Truth-In-Lending Act, 15 U.S.C. sec. 1602(f) and Regulation Z sec. 226.2(a) (17).

57.     At the closing of the subject "loan transaction," Plaintiff executed the Promissory Note and Security Agreement in favor of Defendants as aforesaid.  These transactions, designated by

Defendants as a Loan, extended consumer credit which was subject to a finance charge which was initially payable to the Defendants. As part of the consumer credit transaction the subject of the closing, Defendants retained a security interest in the subject property which was Plaintiff's principal residential dwelling.

58.     Defendants engaged in a pattern and practice of defrauding Plaintiff in that, during the entire life of the mortgage loan, Defendants failed to properly credit payments made; incorrectly calculated interest on the accounts; and have failed to accurately debit fees. At all times material, Defendants had actual knowledge that the Plaintiff's accounts were not accurate but that the Plaintiff would make further payments based on Defendants' inaccurate accounts.

59.     Plaintiff made payments based on improper, inaccurate, and fraudulent representations as to Plaintiff's accounts.

**60.**     Defendants also utilized amounts known to the Defendants to be inaccurate to determine the amount allegedly due and owing for purposes of foreclosure.

61.     Defendants' violations were all material in nature under the Truth-In-Lending Act.

62.     Said violations, in addition to the fact that Plaintiff did not properly receive Notices of Right to Cancel, constitute violations of 15 U.S.C. sec. 1635(a) and (b) and 12 CFR sec. 226.23(b), and are thus a legal basis for and legally extend Plaintiff's right to exercise the remedy of rescission.

63.     On information and belief and given that the consumer credit transaction was an inter-temporal transaction with multiple assignments as part of an aggregation and the creation of a REMIC tranche itself a part of a predetermined and identifiable CMO, all Defendants shared in the illegal proceeds of the transaction; conspired with each other to defraud Plaintiff out of the proceeds of the loan; acted in concert to wrongfully deprive the Plaintiff of her residence; acted in concert and conspiracy to essentially steal the Plaintiff's home and/or convert the Plaintiff's home without providing Plaintiff reasonably equivalent value in exchange; and conducted an illegal enterprise within the meaning of the RICO statute.

64.     On information and belief and given the volume of residential loan transactions solicited and processed by the Defendants, the Defendants have engaged in two or more instances of

racketeering activity involving different victims but utilizing the same method, means, mode, operation, and enterprise with the same intended result.

## CLAIMS FOR RELIEF

### Count I: VIOLATIONS OF HOME OWNERSHIP EQUITY PROTECTION ACT

65.  Plaintiff reaffirms and re-alleges the above paragraphs hereinabove as if set forth more fully herein below.

66.  In 1994, Congress enacted the Home Ownership Equity Protection Act ("HOEPA") which is codified at 15 U.S.C. sec 1639 et seq. with the intention of protecting homeowners from predatory lending practices targeted at vulnerable consumers.  HOEPA requires lenders to make certain defined disclosures and prohibits certain terms from being included in home loans.  In the event of noncompliance, HOEPA imposes civil liability for rescission and statutory and actual damages.

67.  Plaintiff is a "consumer" and each Defendant is a "creditor" as defined by HOEPA.  In the mortgage loan transaction at issue here, Plaintiff is required to pay excessive fees, expenses, and costs which exceeded more than 10% of the amount financed.

68.  Pursuant to HOEPA and specifically 15 U.S.C. sec. 1639(a)(1), each Defendant is required to make certain disclosures to the Plaintiff which are to be made conspicuously and in writing no later than three (3) days prior to the closing.

69.  In the transaction at issue, Defendants were required to make the following disclosure to Plaintiff by no later than three (3) days prior to said closing:

> *"You are not required to complete this agreement merely because you have received these disclosures or have signed a loan application.  If you obtain this loan, the lender will have a mortgage on your home.  You could lose your home and any money you have put into it, if you do not meet your obligation under the loan."*

70.  Defendants violated HOEPA by numerous acts and material omissions, including but not limited to:

> a) failing to make the foregoing disclosure on time or in a conspicuous fashion;
>
> b) engaging in a pattern and practice of extending credit to Plaintiff without regard to her ability to repay in violation of 15 U.S.C. sec 1639(h).

71.    By virtue of the Defendants' violation of HOEPA, Plaintiff has a legal right to rescind the consumer credit transaction, the subject of this action pursuant to 15 U.S.C. sec. 1635.  This Complaint is to be construed, for these purposes, as formal and public notice of Plaintiff's Notice of Rescission of the mortgage and note.

72.    Defendants further violated HOEPA by failing to make additional disclosures, including but not limited to Plaintiff not receiving the required disclosure of the right to rescind the transaction; the failure of Defendants to provide an accurate TIL disclosure; and the amount financed being understated.

73.    As a direct consequence of and in connection with Plaintiff's legal and lawful exercise of her right of rescission, the true "lenders" is required within twenty (20) days of this Notice of Rescission to:

    a)  desist from making any claims for finance charges in the transaction;

    b)  return all monies paid by Plaintiff in connection with the transaction to the Plaintiff

    c)  satisfy all security interests, including mortgages, which were acquired in the transaction

74.    Upon the "true lenders" identification and full performance of its obligations under HOEPA, Plaintiff shall tender all sums to which the true lender is entitled.

75.    Based on Defendants' HOEPA violations, each of the Defendants is liable to the Plaintiff for the following,  which Plaintiff demands as relief:

    a)  rescission of the mortgage loan transactions;

    b)  termination of the mortgage and security interest in the property the subject of the mortgage loan documents created in the transaction;

    c)  return of any money or property paid by the Plaintiff including all payments made in connection with the transactions

    d)  an amount of money equal to twice the finance charge in connection with the transactions

    e)  relinquishment of the right to retain any proceeds; and

    f)  actual damages in an amount to be determined at trial, including costs and attorneys' fees.

**COUNT II: VIOLATIONS OF REAL ESTATE SETTLEMENT PROCEDURES ACT**

76.     Plaintiff reaffirms and re-alleges paragraphs above herein as if specifically set forth more fully herein below.

77.     As mortgage lenders, Defendants are subject to the provisions of Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. sec 2601 et seq.

78.     In violation of 12 U.S.C. sec 2605 and 2607 and in connection with the mortgage loan to Plaintiff, Defendants accepted charges for the rendering of real estate services which were in fact charges for other than services actually performed.

79.     As a result of the Defendants' violations of RESPA, Defendants are liable to Plaintiff in an amount equal to three (3) times the amount of charges paid by Plaintiff for "settlement services" pursuant to 12 U.S.C. sec. 2607(d)(2).

**COUNT III: VIOLATIONS OF FEDERAL TRUTH-IN-LENDING ACT**

Plaintiff reaffirms and re-alleges paragraphs above herein as if set forth more fully herein below.

80.     Defendants failed to include and disclose certain charges in the finance charge shown on the TIL statement, which charges were imposed on Plaintiff incident to the extension of credit to the Plaintiff and were required to be disclosed pursuant to 15 U.S.C. sec. 1065 and Regulation Z sec. 226.4, thus resulting in an improper disclosure of finance charges in violation of 15 U.S.C. sec. 1601 et seq., Regulation Z sec. 22618(d).  Such undisclosed charges include a sum identified on the Settlement Statement listing the amount financed which is different from the sum listed on the original Note.

81.     By calculating the annual percentage rate ("APR") based upon improperly calculated and disclosed amounts, Defendants are in violation of 15 U.S.C. sec 1601 et seq., Regulation Z sec. 226.18 (c), 18(d) and 22.

82.     Defendants' failure to provide the required disclosures provides Plaintiff with the right to rescind the transaction, and Plaintiff, through this public Complaint which is intended to be construed, for purposes of this claim, as a formal Notice of Rescission, hereby elects to rescind the transaction.

83.     In the course of the consumer credit transaction Defendants violated 15 U.S.C. Section 1635 (a) and Regulation Z section 226.23 (b) by failing to deliver to the Plaintiffs two copies of a notice of the right to rescind that:

a)  Identified the transaction.

b)  Clearly and conspicuously disclosed the security interest in the Plaintiff's home.

c)  Clearly and conspicuously disclosed the Plaintiff's right to rescind the transaction.

d)  Clearly and conspicuously disclosed how to exercise the right to rescind the transaction, with a form for that purpose designating the address of Defendant's place of business.

e)  Clearly and conspicuously disclosed the effects of the transaction.

f)  Clearly and conspicuously disclosed the date the rescission period expired.

84.     At the time of settlement on the transaction Plaintiff was not given any copy of the completed loan documents for the loan. Thus Plaintiff has no documents evidencing the completed transaction.

## COUNT IV: VIOLATION OF FAIR CREDIT REPORTING ACT

Plaintiff reaffirms and re-alleges paragraphs above as if set forth more fully herein below.

85.     At all times material, Defendants qualified as a provider of information to the Credit Reporting Agencies, including but not limited to Experian, Equifax, and Trans Union, under the Federal Fair Credit Reporting Act. Defendants wrongfully, improperly, and illegally reported negative information as to the Plaintiff to one or more Credit Reporting Agencies, resulting in Plaintiffs having negative information on his credit reports and the lowering of her FICO scores.

86.     Pursuant to 15 U.S.C. sec. 1781(s)(2)(b), Plaintiff is entitled to maintain a private cause of action against Defendants for an award of damages in the amount to be proven at the time of trail for all violations of the Fair Credit Reporting Act which caused actual damages to Plaintiff, including emotional distress and humiliation.

87.     Plaintiff is entitled to compensatory damages equal to the amount of the loan she was seeking in October, 2007, in the amount of $144,160.00.

**88.**     Plaintiff is entitled to recover damages from Defendants for negligent non-compliance with the Fair Credit Reporting Act pursuant to 15 U.S.C. sec. 1681.

89.     Plaintiff is also entitled to an award of punitive damages against Defendants for their willful noncompliance with the Fair Credit Reporting Act pursuant to 15 U.S.C. sec. 1681 in an amount to be proven at time of trial.

## COUNT V: FRAUDULENT MISREPRESENTATION

Plaintiff reaffirms and re-alleges the paragraphs above as if set forth more fully herein below.

90.     Defendants, by their actions in contracting to provide mortgage loan services and a loan program to Plaintiff which was not only to be best suited to the Plaintiff given her income and expenses, but by which Plaintiff would also be able to satisfy her obligations without risk of losing her home, were "fiduciaries" in which Plaintiff reposed trust and confidence, especially given that Plaintiff was not and is not an investment banker, securities dealer, mortgage lender, or mortgage broker.

91.     Defendants breached their fiduciary duties to the Plaintiff by fraudulently inducing Plaintiff to enter into a mortgage transaction which was contrary to the Plaintiff's stated intentions; contrary to the Plaintiff's interests; and contrary to the Plaintiff's preservation of her home.

92.     As a direct and proximate result of the Defendants' breaches of their fiduciary duties, Plaintiff has suffered damages.

93.     Under the totality of the circumstances, the Defendants' actions were willful, wanton, intentional, and with a callous and reckless disregard to the rights of the Plaintiff justifying an award of not only actual compensatory but also exemplary punitive damages to serve as a deterrent not only as to future conduct of the named Defendants herein, but also to other persons or entities with similar inclinations.

## COUNT VI: UNJUST ENRICHMENT

Plaintiff re-alleges and reaffirms paragraphs above as if set forth more fully herein below.

94.    Defendants had an implied contract with the Plaintiff to ensure that Plaintiff understood all fees which would be paid to the Defendants to obtain credit on Plaintiff's behalf and to not charge any fees which were not related to the settlement of the loan without full disclosure to the Plaintiff.

95.    Defendants had full knowledge that a "bait and switch" adjustable rate predatory mortgage with an increase in the interest rate due to the YSP paid to the Broker for the "up sell" was not in the Plaintiff's best interest.  Defendants cannot, in good conscience and equity, retain the benefits from their actions of charging a higher interest rate, fees, rebates, kickbacks, profits and gains and YSP fee unrelated to settlement services provided at closing.

96.    Defendants have been unjustly enriched at the expense of the Plaintiff, and maintenance of the enrichment would be contrary to the rules and principles of equity.

97.    Plaintiff thus demands restitution from the Defendants in the form of actual damages, exemplary damages, costs and attorney fees.

## COUNT VII: CIVIL CONSPIRACY

Plaintiff reaffirms and re-alleges paragraphs above as if set forth more fully herein below.

98.    In connection with the application for and consummation of the mortgage loan the subject of this action, Defendants agreed, between and among themselves, to engage in actions and a course of conduct designed to further an illegal act or accomplish a legal act by unlawful means and to commit one or more overt acts in furtherance of the conspiracy to defraud the Plaintiff.

99.    Defendants agreed between and among themselves to engage in the conspiracy to defraud for the common purpose of accruing economic gains for themselves at the expense of and detriment to the Plaintiff.

100.   The actions of the Defendants were committed intentionally, willfully, wantonly, and with reckless disregard for the rights of the Plaintiff.

101.   As a direct and proximate result of the actions of the Defendants in combination resulting in fraud and breaches of fiduciary duties, Plaintiff has suffered damages.

102.   Plaintiff thus demands an award of actual, compensatory, and punitive damages.

## COUNT VIII: CIVIL RICO

1    Plaintiff reaffirms and re-alleges paragraphs above as set forth more fully herein below.

2    103.   Defendants are "persons" as defined by state and Federal law.

3    104.   The conspiracy, the subject of this action has existed from the date of application to the

4    present, with the injuries and damages resulting there from being continuing.

5    105.   Defendants' actions and use of multiple corporate entities, multiple parties, and concerted

6    and predetermined acts and conduct specifically designed to defraud Plaintiff constitutes and

7    "enterprise", with the aim and objective of the enterprise being to perpetrate a fraud upon the

8    Plaintiff through the use of intentional nondisclosure, material misrepresentation, and creation

9    of fraudulent loan documents.

10   106.   Each of the Defendants is an "enterprise Defendant." As a direct and proximate result of

11   the actions of the Defendants, Plaintiff has and continues to suffer damages.

12                              **Count IX-Quiet Title**

13   107.   Plaintiff is ignorant of the true names and capacities of Defendants sued herein as JOHN

14   DOES 1 - 1000, inclusive, and therefore sue these Defendants by such fictitious names.

15   108.   Plaintiff is informed and believes and thereon alleges that, at all times herein mentioned,

16   each of the Defendants sued herein was the agent and employee of each of the remaining

17   Defendants and was at all times acting within the purpose and scope of such agency and

18   employment.

19   109.   Plaintiff is and at all times herein mentioned, the owner and/or entitled to possession of

20   the property located at 506 Skyline Drive, Blakeslee, PA 18610.

21   110.   Plaintiff is informed and believes and thereupon alleges that Defendants, and each of

22   them, claim an interest in the property adverse to Plaintiff herein. However, the claim of said

23   Defendant(s) is without any right whatsoever, and said Defendant(s) have no legal or equitable

24   right, claim, or interest in said property.

25   111.   Plaintiff therefore seeks a declaration that the title to the subject property is vested in

26   Plaintiff alone and that the Defendant(s) herein, and each of them, be declared to have not

27   estate, right, title or interest in the subject property and that said Defendants, and each of them

28   be forever enjoined from asserting any estate, right, title or interest in the subject property

adverse to Plaintiff herein.

112.   WHEREFORE, Plaintiff prays judgment against Defendants, and each of them as follows:

    a)   For an order compelling Defendants, and each of them, to transfer legal title and possession of the subject property to Plaintiff herein;

    b)   For a declaration and determination that Plaintiff is the rightful holder of the title to the property and that Defendants herein, and each of them, be declared to have not estate right, title or interest in said property;

    c)   For a judgment forever enjoining said Defendants, and each of them, from claiming any estate, right, title or interest in the subject property;

    d)   For costs of suit herein incurred;

    e)   For such other and further relief as the Court may deem proper.

## Count X—Usury

General Allegations:

113.   The subject loan, note, and mortgage were structured so as to create the appearance of a higher value of the real property than the actual fair market value.

114.   Defendants disguised the transactions to create the appearance of the lender being a properly chartered and registered financial institution authorized to do business and to enter into the subject transaction when in fact the real party in interest was not disclosed to Plaintiff, as aforesaid, and neither were the various fees, rebates, refunds, kickbacks, profits and gains of the various parties who participated in this unlawful scheme.  Said real party in interest, i.e., the source of funding for the loan and the person to whom the note was transmitted or eventually "assigned" was neither a financial institution nor an entity or person authorized, chartered or registered to do business in this State nor to act as banking, lending or other financial institution anywhere else.

115.   As such, this fraudulent scheme (which was in actuality a plan to trick the Plaintiff into signing what would become a negotiable security used to sell unregulated securities under fraudulent and changed terms from the original note), was in fact a sham to use Plaintiff's interest in real property to collect interest in excess of the legal rate.

116.   The transaction involved a loan of money pursuant to a written agreement, and as such, subject to the rate limitation set forth under state and federal law.  The "formula rate" referenced in those laws was exceeded by a factor in excess of 10 contrary to the applicable law and contrary to the requirements for disclosure under TILA and HOEPA.

117.   Under Applicable law, the interest charged on this usurious mortgage prevents any collection or enforcement of principal or interest of the note, voids any security interest thereon, and entitles the Plaintiff to recovery of all money or value paid to Defendants, plus treble damages, interest, costs and attorneys' fees.

118.   Under Applicable Law, Plaintiff is also entitled and demands a permanent injunction to be entered against the Defendants (a) preventing them from taking any action or making any report in furtherance of collection on this alleged debt which was usurious, as aforesaid; (b) requiring the records custodian of the county in which the alleged mortgage and other instruments are recorded to remove same from the record; (c) allowing the filing of said order in the office of the clerk of the property records where the subject property, "loan transaction" and any other documents relating to this transaction are located; and (d) dissolving any lis pendens or notice of pendency relating to the Defendants purported claims.

## RELIEF SOUGHT

WHEREFORE,  having set forth numerous legally sufficient causes of actions against the Defendants, Plaintiff prays for the entry of Final Judgment against all Defendants jointly and severally in an amount not yet quantified but to be proven at trial and such other amounts to be proven at trial, and for costs and attorneys' fees; that the Court find that the transactions the subject of this action are illegal and are deemed void; that the foreclosure which was instituted be deemed and declared illegal and void and that further proceedings in connection with foreclosure be enjoined; and for any other and further relief which is just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands trial by jury of all matters so triable as a matter of right.

Respectfully submitted this ⟍23rd day of February, 2009.

Allison Straker, Plaintiff, Pro Se
506 Skyline Drive
Blakeslee, PA  18610
Phone